IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH HARRISON, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 3:14-cv-2661 |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 13).

The issue before the undersigned is whether the final decision of the Commissioner of Social

Security ("Commissioner") denying Plaintiff Joseph Harrison's ("Plaintiff" or "Harrison")

applications for Supplemental Security Income benefits under Title XVI of the Social Security

Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial

evidence and, therefore, conclusive.

For the reasons set forth below, the Court VACATES the Commissioner's decision and

REMANDS the case back to the Social Security Administration.

## I. PROCEDURAL HISTORY

On January 27, 2012, Plaintiff filed applications for Supplemental Security Income

benefits and Disability Insurance benefits, alleging disability as of November 29, 2011 due to

spinal neuropathy and degenerative disc disease. (Tr. 13, 59).   The Social Security

Administration denied his claim initially and upon reconsideration. (Tr. 59, 67-68, 70, 85).  On

1

July 17, 2012, an ALJ convened an administrative video hearing where Plaintiff, represented by counsel, appeared and testified. (Tr. 27-58).  A vocational expert ("VE"), George Coleman, also appeared and testified. (*Id.*).

On June 27, 2013, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 13-22).  After applying the five-step sequential analysis,[1] the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (*Id.*).  The Appeals Counsel denied Plaintiff's request for review on October 10, 2014. (Tr. 1-3), making the ALJ's June 27, 2013 determination the final decision of the Commissioner. (Tr. 1-3, 13-22).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

## II.  EVIDENCE

### A.  Personal Background Information

Plaintiff was born on July 5, 1976, making him 35 years old as of the alleged date of disability, and 36 years old on the date of the hearing. (Tr. 31, 59).  As a result, Plaintiff was considered a "younger person" for Social Security purposes. 20 C.F.R. §§ 404.1563(c), 416.963(c).  Plaintiff graduated from high school and took engineering courses from a two year technical college, but did not receive a degree.  (Tr. 32-33).  He has past relevant work as a maintenance worker, maintenance data coordinator, and a mechanic. (Tr. 66-67, 84).

### B.  Medical Evidence[2]

Sudesh S. Reddy, M.D.

Prior to the alleged onset date, Plaintiff presented to his primary care physician, Sudesh S. Reddy, M.D., on multiple occasions since 2008 complaining of severe lower back pain (Tr. 417-19).  On order from Dr. Reddy, Plaintiff underwent an MRI of his lumbar spine on June 10, 2008, showing shallow bulging at the L5-S1 and L4-L5 levels, and associated mild bilateral facet arthrosis at L5-S1.  (Tr. 430).  Treatment notes from October 13, 2009 indicated a referral to Dr. Bonasso for a surgical consultation.  (Tr. 417).  On October 27, 2009, Plaintiff requested more Vicodin and Flexeril for two collapsed discs in his back, saying he needed to take them every two hours to function.  (Tr. 416).  Examination notes dated February 1, 2010, showed Plaintiff stated he had been in pain and had not taken Vicodin since October of 2009, and requested more pain medication, although Dr. Reddy explained he would not prescribe Vicodin for chronic pain.  (Tr. 414).  Examination showed tenderness at the L4-L5 level, 4/5 strength bilaterally, and

---

[2] The following recital is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.  Plaintiff's challenges to the ALJ's findings relate primarily to his physical impairments.  Accordingly, this summary focuses on medical evidence relating to Plaintiff's physical condition during the relevant period, although the record includes evidence pertaining to Plaintiff's physical and mental impairments.

spasms along the L3-L5 paraspinals.  (*Id.*).  On February 10, 2010, Plaintiff was diagnosed with L-S spine chronic pain, and Dr. Reddy noted negative findings/no acute changes shown in an x-ray of Plaintiff's L/S spine, dated February 15, 2010.  (Tr. 412-13, 427).

Following back surgery with Dr. Bonasso, performed June 11, 2010, Plaintiff had a follow-up examination with Dr. Reddy on June 21, 2010.  (Tr. 411).  Examination notes showed Plaintiff was doing well, and had no pain in his back or legs.  (*Id.*).  Dr. Reddy's notes dated January 3, 2012, stated Plaintiff had gone back to work following his surgery in September of 2010, but that he had not worked since problems with his legs caused him to fall into a machine at work.  (Tr. 406).  After reviewing Plaintiff's functional capacity assessment performed Janaury 3, 2012, Dr. Reddy noted it said Plaintiff could not be gainfully employed.  (*Id.*).  Dr. Reddy extended Plaintiff's time off work until May of 2012, and encouraged him to apply for disability.  (*Id.*).

Plaintiff continued to complain of back pain in July and August of 2012, and Dr. Reddy referred him to pain management, although Plaintiff stated he could not afford it.  (Tr. 404-05).  Dr. Reddy also issued Plaintiff a slip to obtain a handicapped parking permit in May of 2012.  (Tr. 405).

Christian Bonasso, M.D.

Plaintiff presented at the Marion Clinic for a surgical consultation with Christian Bonasso, M.D., on October 21, 2009.  (Tr. 317).  Plaintiff informed Dr. Bonasso that he had suffered from lower back pain for years, with no relief from medications, therapy, or injections.  (*Id.*).  Examination showed Plaintiff had 5/5 strength in both upper and lower extremities, and after review of an MRI scan, Dr. Bonasso diagnosed Plaintiff with degenerative disc disease with biforaminal encroachment at L4-L5 and L5-S1.  (*Id.*).  Noting his age and work history as a

4

mechanic, Dr. Bonasso informed Plaintiff an interbody fusion at L4-L5 and S1 may limit his abilities as a mechanic.  (Tr. 317-18).  On April 6, 2010, following a positive discography at L4-L5 and L5-S1, Dr. Bonasso documented that conservative treatment had failed, and Plaintiff would undergo a surgical procedure including decompression, fusion and fixation with interbody grafting at L4-L5 and L5-S1, which was performed on June 11, 2010.  (Tr. 319, 343-45).

After the surgery, Plaintiff had a follow-up appointment on July 7, 2010, at which time Dr. Bonasso reported Plaintiff was doing well, could now feel his leg, and that postoperative films looked good.  (Tr. 321).  Dr. Bonasso directed Plaintiff to stay off work until September of 2010.  (*Id.*).  Plaintiff was reported as stable and off all pain medication two months after the operation, in treatment notes dated September 1, 2010, where Dr. Bonasso further noted Plaintiff would be returning to work the following week.  (Tr. 322).  On November 29, 2011, Plaintiff returned to Dr. Bonasso with complaints for dysesthetic pain down both his legs.  (Tr. 324).  Dr. Bonasso reviewed MRI, X-rays, and Plaintiff's EMG, finding completely normal results, but nonetheless started Plaintiff back on Neurontin and provided him with a two week off-work slip, noting he believed Plaintiff's job may be aggravating his condition.  (Tr. 323-24).  When questioned as to whether Plaintiff should apply for disability, Dr. Bonasso did not give Plaintiff an opinion, but referred him for an occupational medicine exam (which was performed on December 12, 2011, described in detail below), and noted he would not recommend further surgery at that point.  (323).

On December 12, 2011, Plaintiff presented for a functional capacity evaluation at Physiotherapy Associates, and was evaluated by Scott Secrest, MS, OT/L.   (Tr. 389-403).  Based on review of client reports and provided medical documentation, Mr. Secrest noted Plaintiff had a history of back pain, having been diagnosed on 1998 with degenerative disc

disease.  (Tr. 389).  Noting a rapid progression of symptoms, Mr. Secrest stated Plaintiff had periods when he could not work due to increased pain and functional limitations, and that his diagnosis was treated conservatively with medication, physical therapy, and injections, until undergoing surgery in June of 2010.  (*Id.*).  Mr. Secrest further remarked that, while Plaintiff initially showed marked improvement following surgery, his symptoms gradually returned and progressed, currently managed again with physical therapy, injections, and medication.  (*Id.*). Mr. Secrest further noted Dr. Bonasso had recently restricted Plaintiff from work due to increased safety risk with work related activities.  (*Id.*).

Mr. Secrest noted during the intake interview that Plaintiff's functional movements including transitions from sitting/standing and walking were extremely guarded, and that he reported a pain level of 8 out of 10.  (Tr. 389).  Examination showed Plaintiff exhibited significant limitations in all components of work, including material handling, positional tasks, and mobility tasks.  (Tr. 386).  Lumbar testing showed positive results bilaterally, and lumbar range of motion was at 25% of normal results.  (Tr. 393).  Mr. Secrest further concluded that, based on statistical and clinical indicators, Plaintiff provided a sincere effort throughout the evaluation, and the results were an accurate representation of his abilities, with 14 of 14 consistency measures within expected limits.  (Tr. 390, 394, 396).

Mr. Secrest concluded, based on his evaluation, Plaintiff's movement patterns, and his subjective reports, that Plaintiff's feasibility for returning to competitive employment was marginal at best.  (Tr. 387).  In so finding, Mr. Secrest opined that Plaintiff had insufficient functional range of motion to perform any lifting from floor level, and required frequent, at-will opportunities to make transitions between sitting and standing.  (*Id*).  Further, even with such transitional opportunities, Mr. Secrest stated Plaintiff's pace of movement and frequent pain

behaviors would not be acceptable within competitive vocational environments, and therefore he could not confidently recommend Plaintiff return to work.  (*Id.*).

On January 16, 2012, a Nurse Case Manager for disability case management at Liberty Mutual Insurance requested answers to specific questions regarding Plaintiff's functioning capacity evaluation performed by Mr. Secrest.  (Tr. 376).  Dr. Bonasso stated he agreed with Mr. Secrest's conclusion that Plaintiff's return to competitive employment was marginal at best. (*Id.*).  He further expressed that Plaintiff was limited to no repetitive bending, no lifting greater than 20 pounds, and that he needed to change position every 15 minutes.  (*Id.*).  Dr. Bonasso also stated he found these limitations to be permanent, and indicated Plaintiff's current treatment plan included Neurontin and was considering a possible spinal cord stimulator (SCS) trial.  (*Id.*).

David McGue, P.A.-C

Plaintiff presented at the Veteran's Administration on October 16, 2012, with a chief complaint of low back pain.  (Tr. 457).  Plaintiff was seen by David McGue, P.A.-C, who noted his surgical history and reports of chronic low back pain and a limited range of motion.  (*Id.*). P.A. McGue noted that examination showed Plaintiff exhibited stable station and gait, but could flex only to above the waist with pain, and extensions only 0-5 degrees with pain bilaterally at the paraspinal muscle groups.  (Tr. 459).  Further examination of his lumbar spine showed positive results for midline, facet tenderness, as well as increased pain with deep palpitation of the paraspinal muscle, and with flexion, extension, side-bending and rotation.  (Tr. 460).  P.A. McGue also noted positive pain in the paraspinal muscle groups in all range of motion of the back, increased his Neurontin dosage, and added a prescription for meloxicam to help control the pain.  (*Id.*).

At a follow-up visit with P.A. McGue on February 11, 2013, Plaintiff reported he had loss of sensation in the urinary tract, and recent increase of pain, reported as 8/10 on the pain scale, and worse with almost any movement.  (Tr. 519).  On examination, P.A. McGue found low back area pain on the right and left-sided paraspinal muscle group, and positive patella deep tendon reflexes bilaterally, noting Plaintiff had difficulty with range of motion due to lower back pain.  (Tr. 520).  Plaintiff also was documented as having a labored gait, and P.A. McGue again increased his Neurontin dosage.  (Tr. 519-20).

On February 22, 2013, Plaintiff reported to a VA nurse that he experienced dizziness due to his pain medications, which were of poor effect.  (Tr. 517-18).  On February 20, 2013, Plaintiff again presented at the Veteran's Administration for physical therapy, equipment fitting, and training consultation related to his chronic low back pain.  (Tr. 516).  At this time, Plaintiff was fitted for, and issued, a straight cane for use as an ambulatory aid.  (Tr. 516-17).  Plaintiff was referred to Mehr Siddiqui, M.D., for a neurology consultation on April 4, 2013.  (Tr. 511-12).  Plaintiff stated his pain was unchanged since his last visit, was worse with sitting and standing, and that medication helped a little, but had side effects of irritability, sleeplessness, and losing blocks of time.  (Tr. 509, 512).  Dr. Siddiqui noted Plaintiff had a normal gait, but indicated Plaintiff tested positive when he performed a Romberg test.  (Tr. 511).  Plaintiff was diagnosed with paraesthesias of the lower limbs and L5-S1 radiculopathy, but concluded there was no evidence of a spinal cord lesion.  (*Id.*).

State Agency

On May 22, 2012, state agency doctor Khozema Rajkotwala, M.D., conducted a consultative examination on Plaintiff.  (Tr. 442-48).  Notes stated Plaintiff arrived alone, and he did not need any ambulatory aide.  (Tr. 446).  Plaintiff reported a history of leg numbness, but

that he was not currently experiencing any numbness because he had been resting his legs.  (*Id.*).

He further reported that he had difficulty sitting, standing, and walking for more than 10-15

minutes, and Dr. Rajkotwala's examination notes showed that Plaintiff had difficulty sitting in

his chair then moving to the examination table, although he opined that "[t]he patient can sit,

stand, and walk with no difficulty."  (Tr. 446, 448).  On examination, Plaintiff showed 5/5 motor

function in his upper and lower extremities, and generally intact range of motion, except he

exhibited limited range of motion at his dorsolumbar spine.  (Tr. 442-45, 447).  Dr. Rajkotwala

further opined that Plaintiff had the ability to lift and carry five to ten pounds frequently, and

fifteen to twenty pounds occasionally.  (Tr. 448).

On June 4, 2012, state agency reviewing physician, William Bolz, M.D., reviewed the

medical evidence of record and formulated an opinion as to Plaintiff's exertional limitations.

(Tr. 64-66).  Dr. Bolz found Plaintiff was able to occasionally lift or carry twenty pounds, and

frequently lift or carry ten pounds, in an eight hour work day.  (Tr. 65).  Further, Dr. Bolz opined

Plaintiff could stand or walk for a total of four hours, sit for six hours, and had no limitations in

his ability to push or pull, but could frequently climb ladders, ropes, and scaffolds, and

frequently stoop.  (*Id.*).  Dr. Bolz did not provide any specific evidence to explain his exertional

limitations other than to again state he is able to stand and walk for four hours.  (*Id.*).

State agency reviewer Maureen Gallagher, D.O., provided an opinion on December 3,

2012.  (Tr. 79-81).  Dr. Gallagher found Plaintiff was capable of carrying twenty pounds

occasionally and ten pounds frequently, and could stand or walk and sit for four hours in an eight

hour day.  (Tr. 80).  However, Dr. Gallagher opined that Plaintiff could only walk for thirty

minutes at a time, and that he must periodically alternate sitting and standing, at will, to relieve

pain and discomfort, noting at his examination Plaintiff had difficulty sitting and moving to the

examination table, as well as forward flex to waist only with pain.  (*Id.*).  Further, Dr. Gallagher's opinion stated Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, and could never crawl or climb ladders, ropes, or scaffolds.  (*Id.*).

### C.  Plaintiff's Testimony

During the hearing, Plaintiff requested permission from the ALJ to stand up for a minute during his testimony, which the ALJ granted, stating Plaintiff was free to stand up whenever he needed to.  (Tr. 34).  Plaintiff testified he is unable to work because of his back pain, which will cause his feet and legs to go numb, as well as his not being able to stay sitting or standing for very long.  (Tr. 36).  He stated he underwent multiple injections and therapy for his spine, and that he was able to return to work following surgery.  (*Id.*).  However, Plaintiff further testified that in November of 2011, following increased pain and incidences of his legs not working right, his legs gave out and he fell into a machine at work.  (Tr. 36-37).  Regarding his medication, Plaintiff testified that he takes Meloxicam to alleviate swelling in his spine, and takes the maximum allowed dosage of Neurontin for the pain, but that it only helps for the first hour after he takes it, and he believes he is building up a tolerance for it.  (Tr. 37).  Plaintiff testified he gets some relief when lying down, but that a hot, spiking pain returns within minutes of standing back up, and he experiences excruciating pain and hot tingling numbness in his legs if he sits up in a chair  (Tr. 38-39).  According to his testimony, walking is the most painful for Plaintiff, with pain shooting down his legs with each step.  (Tr. 40).

Plaintiff presented at the hearing with a cane, and testified that he had been using the cane ninety-five percent of the time for the past few months.  (Tr. 40).  Plaintiff stated P.A. MaGue from the VA sent him to a physical therapy specialist in Columbus, and that it was recommended he use the cane for stabilization and to take the pressure off nerves when he

walked.  (*Id.*).  Plaintiff testified his wife drove him to the hearing, and they had to stop every fifteen to twenty minutes and he rode with the seat reclined all the way down.  (Tr. 41).  Further, Plaintiff testified he is able to drive sometimes for very short distances, with an example of to the store two miles from his house.  (Tr. 41-42).  Relating to his surgery, Plaintiff expressed that Dr. Bonasso was of the opinion that there were no more surgeries he could perform at that time that would provide any benefit to Plaintiff, but that the VA neurosurgeon suggested they may have to eventually remove scar tissue from the nerves and spinal cord.  (Tr. 47).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant did not engage in substantial gainful activity since November 29, 2011, the alleged onset date.

3. The claimant has the following severe impairments: disorders of the back, urinary incontinence, cholelithiasis, an anxiety disorder, depression, and post-traumatic stress disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work, as defined in 20 CFR 404.1567(a), except that he should never crawl or climb ladders, ropes and scaffolds, and can only occasionally stoop, kneel, crouch and balance.  The claimant also requires the ability to change from a sitting position to a standing position (and vice-versa) at least every thirty minutes.  Furthermore, the claimant should avoid all exposure to the use of hazardous machinery, operational control of moving machinery, and unprotected heights.  Finally, the claimant is limited to the performance of simple, routine and repetitive tasks, in a work environment where changes occur on no more than an occasional basis, and where there is no greater than occasional interaction with coworkers or the public.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on July 5, 1976 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(Tr. 385-95) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984)*; *Richardson v. Perales, 402 U.S. 389, 401 (1971)*. "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might

accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983)*.  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs., 884 F.2d 241, 245 (6th Cir. 1989)*.

## VI.  ANALYSIS

### A.  Medical Opinion Evaluation - Treating Source Analysis

Plaintiff first alleges that the ALJ erred in his analysis and attribution of weight to the opinion of his treating specialist, Christian Bonasso, M.D. (including the FCE performed at his direction).  Plaintiff asserts the ALJ did not articulate valid reasons for the weight assigned to the treating source's opinion, or otherwise adhere to the treating source rule in general.  It is well-established that an ALJ must give special attention to the findings of a claimant's treating sources.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  This doctrine, referred to as the "treating source rule," recognizes that physicians who have a long-standing relationship with an individual are best-equipped to provide a complete picture of the person's health and treatment history.  *Id*; 20 C.F.R. § 416.927(c)(2).  Opinions from treating physicians are entitled to controlling weight only if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record."  *Id.*

When an ALJ determines a treating physician's opinion is not entitled to controlling weight, the ALJ must consider the following factors in deciding what weight is appropriate: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) any other factors which tend to support or contradict the opinion. *Id.* Moreover, the regulations require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions. *Id.*; *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 550 (6th Cir. 2010) ("The ALJ's decision as to how much weight to accord a medical opinion must be accompanied by 'good reasons' that are 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'") (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996)). "This procedural 'good reason' rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of his case." *Id.* at 551-52 (*citing Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)) (internal page numbers omitted).

At the outset, Dr. Bonasso was clearly a "treating physician" requiring application of treating source analysis. A physician may be deemed a "treating source" if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (alteration in original) (*quoting* 20 C.F.R. § 404.1502). Records show Plaintiff sought treatment from Dr. Bonasso for his back pain beginning in October of 2009, and continuing through at least January of 2012 (although the record reflected the possibility of

treatment past that date).  (Tr. 317-18, 376).  Treatment notes showed Plaintiff had multiple office visits, surgery, diagnostic testing, and medication management through Dr. Bonasso over the years, as well as a referral for, and review of, a functional capacity evaluation performed in December of 2011.  (*Id.*).  Nothing indicates this is not of a standard frequency for treatment by a surgical specialist so as to avoid classification as a treating source.  As a result, the ALJ was required to apply the treating source rule in his analysis, and give "good reasons" for discounting Dr. Banasso's assessment.

After providing a brief description of Dr. Bonasso's treatment records, as well as the FCE (performed by a physical therapist at his direction), the ALJ found the opinion that Plaintiff was limited to sedentary or less than sedentary work, along with "other limitations" was only "partially credible."  (Tr. 19-20).  In support, the ALJ reasoned the opinion was in contrast to those of the state agency doctors who found Plaintiff could perform a sedentary to light range of work with additional postural and environmental limitations.  (Tr. 20).  He continued to explain:

> [T]here was little support within the claimant's broader treatment record or in other evidence to indicate that he was quite as limited as indicated in the functional capacity assessment or to corroborate Dr. Bonasso's assessment that the claimant had marginal ability to re-enter the workplace.  …Overall, the weight of the evidence indicated that the claimant was somewhat more limited than indicated by the State agency doctors…but not quite as limited as identified by the therapist and Dr. Bonasso.

(Tr. 20-21) (no internal citations).  The ALJ further discredited the FCE specifically, by pointing out that the report "noted several times that many of the limiting factors of the test were the claimant's reports of pain," and made the generalized statement that the limitations in the FCE were not supported by "his broader record."  (Tr. 20).

Recently, a District Judge in the Northern District of Ohio found an ALJ's analysis of a treating psychologist's opinion was not sufficiently specific to satisfy the "good reasons"

requirement of the treating source rule.  In *Fumich v. Comm'r of Soc. Sec.*, after previously giving a brief analysis of his treatment records, the ALJ gave "little weight" to the opinion of a claimant's treating psychologist, Dr. Bruce Sampsel.  No. 5:14-CV-2307, 2016 WL 796094, at *4-5 (N.D. Ohio Feb. 29, 2016).  Citing generally to the record and noting that Dr. Sampsel's notes indicated the claimant had marked impairment in mental functioning due to his diagnosis of mood disorder and difficulties with anger and impulsiveness, the ALJ determined:

> These opinions are given little weight as they are inconsistent with Dr. Sampsel's treatment records, especially more recent records, which demonstrate improvement with medications.  Further, the claimant's activities of daily living do not support marked limitations.  Marked limitations are also inconsistent with the claimant's prior consultative examination, which noted very mild limitations (14F).

*Fumich*, 2016 WL 796094 at *4 (internal page numbers omitted).  The District Judge concluded that this analysis, along with the brief earlier analysis of Dr. Sampsel's treatment records, was insufficient for the following reasons:  (1) the ALJ did not identify Dr. Sampsel as the claimant's treating psychologist; (2) the ALJ failed to explicitly state that he was not giving Dr. Sampsel's opinion controlling weight; and (3) the "ALJ did not identify or provide citations to the evidence he relied upon, other than to narrow it down to 'more recent records…[and] claimant's prior consultative examination, which noted very mild limitations (14F).'"  *Id*.

Here, the ALJ's analysis of Dr. Bonasso and the medical evidence of record suffer from similar flaws.  First, nowhere in the opinion does the ALJ refer to Dr. Bonasso as a "treating source."  Next, the ALJ never specified the weight accorded to Dr. Bonasso's opinion, and rather found it, along with the opinions of state agency consultants, was only "partially credible."  (Tr. 20).  Finally, and most detrimental, is the ALJ's overwhelming failure to identify the specific evidence relied on, or provide citations to the record for the majority of his medical source

16

analysis (as well as the credibility analysis) relating to limitations caused by Plaintiff's back problems, as discussed more fully below.

The ALJ repeatedly supported his determination to not fully credit Dr. Bonasso's opinion based on a lack of support in the "broader record." (*Id.*).  However, nowhere in this part of the analysis did the ALJ point to specific findings or limiting factors in the "broader record" that he considered, other than the level of work at which Plaintiff could perform.  (*Id.*).  Nor is it clear where the evidence to which he generally alludes could be found in the broader record, as the ALJ did not cite to specific reports or page numbers in the record.  (*Id.*).   Further, the ALJ's apparent directive to refer to other relevant discussions in the decision does not save his analysis, as review of the decision as a whole shows the ALJ's previous discussions of the record evidence relating to Plaintiff's back impairments, predominantly found in his credibility analysis, suffer from the same failure on the part of the ALJ to clearly articulate the evidence relied upon, or to properly cite to the record.

The undersigned further finds that the ALJ's treating source analysis fails because it is not clear whether the ALJ actually considered all the relevant evidence of record.  It is well-established that for an ALJ's decision to stand, the ALJ is not required to discuss every piece of evidence in the record. *See*, *e.g.*, *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, "[i]n rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (*citing Bryan v. Comm'r of Soc. Sec.*, 383 Fed. App'x 140, 148 (3d Cir. 2010) (*quoting Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual

functional capacity determination,' and must also 'mention or refute […] contradictory, objective medical evidence' presented to him.")).  Although it is up to the ALJ to weigh the evidence, he cannot merely disregard evidence that is contrary to his view.  *Id.*  Rather, the ALJ must explain the evidence considered in a way that allows a subsequent reviewer to know why evidence was valued or rejected.  *See id.*  Here, due to the decision's lack of specificity throughout the opinion, both in the medical source opinion analysis and elsewhere, it is not clear what evidence the ALJ considered to reach this determination, or whether certain evidence was considered at all.

First, Plaintiff maintains that the ALJ failed to account for the validity of effort provisions of the FCE testing.  While the ALJ makes a general statement that the "therapist felt that the claimant gave a valid effort," the ALJ's decision provided reference only to two specific pages of the FCE report, neither of which included the validity testing provisions, leaving it unclear whether this was considered by the ALJ.  (Tr. 20, 387, 391).  Second, despite acknowledging "*some* positive physical findings including reduced spinal range of motion, postural limitations, and *other findings* consistent with ongoing back and lower extremity impairments," the ALJ then went on to determine these findings were not consistent with severe or profound impairments due to "multiple records" showing intact balance, full strength in his extremities, and stable gate and station.  (Tr. 17) (emphasis added).  As Plaintiff points out in his brief, the ALJ failed to cite to the record, or even mention which doctors' treatment records were evaluated at this step of analysis, to support his determination.  (*Id.*).  Additionally, Plaintiff points to evidence that calls into question the ALJ's finding that the evidence did not support Plaintiff's allegation that he required the use of a cane for ambulation and balance, or that any of his providers indicated he needed a cane.  Specifically, Plaintiff points to: (1) records of a physical medicine rehabilitation consultation with the VA where he was fitted for a full weight

18

bearing cane, following a provisional diagnoses of chronic low back pain;[3] (2) treatment notes showing a labored gait when examined by P.A. McGue in February of 2013; and (3) a positive Romberg test when examined by Dr. Siddiqui in April of 2013.  (Tr. 509-11, 516-17, 520). Although such evidence is not conclusive and is subject to the ALJ's discretionary analysis, the decision nonetheless does not make clear whether it was even considered, or wholly omitted, from the ALJ's analysis.

The ALJ further buttressed his rejection of more severe physical limitations by reasoning that "treatment providers did not consistently opine that they felt he had severe and profound limitations or that the claimant was unable to return to work," and that the record was devoid of diagnostic notes validating the limitations.  However, once more, these generalized statements are not supported by citation to the record.  Arguing against this assertion, Plaintiff points out that the treatment notes of his primary care physician, Dr. Reddy, showed he encouraged Plaintiff to apply for disability in January of 2012, and noted that his FCE indicated Plaintiff could not be gainfully employed.  (Tr. 406).  Further, Dr. Bonasso agreed with the findings of the FCE, which stated Plaintiff's ability to return to competitive employment was marginal at best, and that the restrictions as to Plaintiff's work-related abilities as expressed by Dr. Bonasso were permanent. (Tr. 376).  Although the ALJ could have properly considered this evidence and determined it did not support more substantial limitations, the record does not reveal whether this evidence was actually considered, or if considered, specifically why it was rejected.

---

[3] The regulations require medical documentation establishing the need for an ambulatory device, and describing the circumstances for which it is needed.  *Robinson v. Comm'r of Soc. Sec.*, No. 5:14-CV-291, 2015 WL 1119751, at *14 (N.D. Ohio Mar. 11, 2015) (*citing* S.S.R. 96-9p, 1996 WL 374185, at *7 (July 2, 1996)).  "A recent case noted that: 'A cane would be medically necessary if the record reflects more than just a subjective desire on the part of the plaintiff as to the use of a cane.'"  *Id.* at *15 (*quoting Murphy v. Astrue*, No. 2:11-CV-114, 2013 WL 829316, at *10 (M.D. Tenn. Mar. 6, 2013) (Report and Recommendation, *adopted by Murphy v. Colvin*, No. 2:11-CV-114, WL 4501416 (M.D. Tenn. Aug. 22, 2013)).

The government provides some explanations that suggest how the ALJ might have viewed the evidence that could lead to the conclusions found in the decision. For example, the government asserted Dr. Bonasso's statement that he could not answer Plaintiff's inquiry as to whether he should apply for disability showed Dr. Bonasso did not believe Plaintiff was disabled. (Def. Brief p. 6). Further, the government stated the ALJ's decision not to assign complete deference to Dr. Bonasso was supported because his treatment records showed a rapid change in position—specifically, that he provided an off-work slip for only two weeks from a physically demanding job, then two months later opined Plaintiff had only a marginal chance of performing any job. However, these explanations are not found in the decision itself, and it is improper for the Court to affirm an ALJ's decision based on *post hoc* rationalizations submitted by the Commissioner. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009); *Martinez v. Comm'r of Soc. Sec.*, 692 F. Supp.2d 822, 826 (N.D. Ohio 2010).

The Court will reverse and remand the decision of the ALJ for failing to give good reasons on the record for according less than controlling weight to a treating source, unless the error constitutes a harmless, *de minimus* procedural violation. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009). The error may be considered harmless where: (1) the opinion of the treating source is so patently deficient that the ALJ could not possibly credit it; (2) the treating source opinion is adopted or the ALJ makes findings consistent with that opinion; or (3) the goal of 20 C.F.R. § 404.1527(d)(2) which provides for the "good reasons" procedural safeguards has been met even though the ALJ has not complied with the terms of the regulation. *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. App'x 462, 470 (6th Cir. 2006) (*citing Wilson*, 378 F.3d at 547). "In the last of these circumstances, the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other

20

evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." *Friend*, 375 Fed. App'x 543, 551 (6th Cir. 2010) (*citing Nelson*, 195 Fed. App'x at 470-72; *citing Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006))

The ALJ's treating source analysis of Dr. Bonasso's opinion is not harmless error.  The undersigned does not find Dr. Bonasso's opinion to be patently deficient.  Nor did the ALJ fully adopt his opinion with respect to Plaintiff's limitations stemming from his back impairments. Moreover, the ALJ did not make clear the basis on which Dr. Bonasso's opinion was discredited through an indirect analysis.   As stated above, the ALJ discussed the medical evidence pertaining to Plaintiff's back impairments prior to his medical source opinion analysis, when assessing Plaintiff's credibility.  (Tr. 17-18).  Although the ALJ acknowledged medical evidence, such as medical notes from treatment by Plaintiff's primary care doctor and specialists (notably not referred to by name) that showed stable station and gait, reduced spinal range of motion and postural limitations, and unremarkable test results, the opinion failed to point to *specific* evidence or cite to the record.  (Tr. 17-20).  Further, in finding Plaintiff's subjective complaints of pain inconsistent with the medical evidence, the majority of the ALJ's credibility  analysis relating to Plaintiff's back injury and pain did not cite to the record beyond a blanket reference to treatment notes and records, and does not allow a reviewer to determine the specific basis for the ALJ's ultimate determination.  (*Id.*); *Fumich*, 2016 WL 796094 at *4-5; *see generally Burbridge v. Comm'r of Soc. Sec.*, 572 Fed. App'x 412, 216 (6th Cir. 2014) (finding non-specific cites to exhibits are insufficient to show the "reasons or basis" for an ALJ's findings where the evidence could also support a different conclusion).  Accordingly, because the ALJ did not provide a sufficient discussion of the medical evidence pertaining to Plaintiff's back impairments

elsewhere in the opinion, he failed to "implicitly provide[] sufficient reasons for the rejection of [Dr. Bonasso's] opinion," so as to enable this Court to find the ALJ's inadequate treating source analysis amounted to harmless error.  *Friend*, 375 Fed. App'x at 552 (*quoting Hall*, 148 F. App'x at 464).

Accordingly, Plaintiff's argument that the ALJ did not provide a proper analysis of his treating source, Dr. Bonasso, is well-taken.  The Court finds that the ALJ did not follow its own regulations in evaluating the opinion of Dr. Bonasso in consideration of the record evidence, and failed to explain the weight ultimately assigned, supported by good reasons.  As Dr. Bonasso's opinion was not patently deficient, was not adopted by the ALJ, and the ALJ did not provide a sufficient indirect explanation that accounted for the discrediting of the opinion elsewhere in his opinion, this was not harmless error.  Thus, the Court must remand the case back to the Commissioner for a full and proper analysis of the medical evidence, including Plaintiff's treating source(s).

Because remand is appropriate to address the deficiencies of the medical opinion evidence analysis—most specifically the treating source analysis—it is not necessary for this Court to reach the merits of Plaintiff's assignments of error relating to the ALJ's credibility analysis and his findings at Step Five.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the Court VACATES the decision of the Commissioner and REMANDS the case to the Social Security Administration.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: <u>March 7, 2016.</u>